UNITED STATES of America, for the Use and Benefit of MORETRENCH AMERICAN CORPORATION, Plaintiff,

v.

McCLURE ELECTRICAL CONSTRUCTORS, INC., and the Travelers Indemnity Company, Defendants.

No. PCA 74–105.

United States District Court,
N. D. Florida,
Pensacola Division.

June 20, 1975.

---

Jon D. White, Pensacola, Fla., for plaintiff.

Gary B. Lane, Pensacola, Fla., James B. Ritchie, Atlanta, Ga., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on April 23, 1975. Having considered the testimony, exhibits, stipulations and arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. This action was brought under the Miller Act, 40 U.S.C. 270a–270d, by the use plaintiff Moretrench American Corporation (Moretrench) seeking to recover from the defendants McClure Electrical Constructors, Inc. (McClure) and the Travelers Indemnity Company (Travelers) the sum of $16,643.18 as the balance due on a rental contract for a wellpoint system, including certain service and repair invoices, furnished by Moretrench to McClure.

2. The defendant McClure, and thereby Travelers, asserts in defense a failure of consideration on the part of Moretrench in that allegedly the wellpoint system did not function properly. McClure therefore claims that it is entitled to a substantial offset against the amount owed Moretrench under the rental contract. However, McClure does not assert any counterclaim against Moretrench for any damages beyond the aforementioned offset.

3. Ranger Construction Company (Ranger), a general contractor, entered

into a contract with the United States of America to perform construction work on an aircraft assembly hangar at the Naval Air Rework Facility, Pensacola, Florida. The defendant Travelers was surety on the payment bond furnished to the United States government by Ranger pursuant to the requirements of 40 U.S. C. § 270b(a). In pursuit of its general contract, Ranger entered into an electrical subcontract with the defendant McClure. Subsequently, on July 17, 1973, McClure entered into a contract with Moretrench in which Moretrench agreed to rent to McClure a wellpoint system to be used in the performance of its electrical subcontract and McClure agreed to pay the rental price as set forth in the contract. The Pensacola area has a high water table and sandy, marshy soil. Use of a wellpoint system was necessary in order for McClure to proceed with its subcontract which involved a large amount of underground electrical work.

4. Under the rental contract McClure agreed to pay rent at the following rates, plus tax: $3,815.00 for the first 30 day period; $2,225.00 for the second 30 day period; and $1,981.00 for each succeeding 30 day period.[1] Other pertinent provisions of the contract which read as follows:

8. This agreement (together with the supplemental conditions, etc., as printed on the back of this sheet) contains all of the agreement between Lessor and Lessee and is to be binding upon the heirs, executors, administrators, successors, and assigns of both parties hereto, when approved by Lessor at its Main Office at Rockaway, New Jersey. No representations or statements have been made by Lessor concerning the Goods except as herein stated, and no warranty, express or implied, by Lessor, arises apart from this writing.

19. Lessee will pay, upon receipt of invoice, for labor parts, transportation and living expenses, in connection with any on-job repairs required, unless such repairs are required as the result of defects in the equipment when originally furnished. Lessee will also pay for any on-job services by others, when such services are not authorized by the Lessor in writing.

23. The liability of Lessor to Lessee is expressly limited to the free replacement (f. o. b. point of shipment) of any defective part or parts of the equipment furnished under or subsequent to this agreement on receipt by Lessor of said defective part or parts f. o. b. Rockaway, New Jersey, provided such defect is not caused by misuse or neglect on the part of Lessee.

Lessor makes no warranty of merchantability of the Goods or of their fitness for any purpose, nor any other warranty of any kind, express or implied, except that Lessor agrees to replace, without charge, f. o. b. point of shipment, any part or parts adjudged by the Lessor to be defective; provided such defect is not caused by misuse or neglect on the part of Lessee. Said guaranty to be Lessee's sole and exclusive remedy. The Lessor shall not be liable for damages due to delays arising from goods or equipment supplied hereunder nor will any allowance be granted for repairs or alterations made by the Lessee without the written consent of the Lessor.

5. A stipulation was entered by all parties that, assuming the wellpoint system was satisfactory, the unpaid amount due on the rental contract from McClure to Moretrench would be $16,643.18. This figure takes into account payments made by McClure totaling $2,245.15.

6. The wellpoint system was delivered to McClure in July 1973, with the rental period commencing on the 26th of that month. On March 4, 1974, Moretrench terminated the rental contract for failure to pay rent, and the equip-

---

1. With Florida tax of 4%, the sums would be $3,967.60, $2,314.00 and $2,060.24, respectively.

ment was returned to Moretrench by McClure on March 15, 1974.

7. On several occasions between July 26, 1973, and March 4, 1974, the wellpoint system either failed to operate or, although operating, failed to perform to the satisfaction of McClure. A factual dispute arose between the parties as to the reasons for the failure. It is this factual dispute which constitutes the heart of this litigation.

8. In support of its right to an offset, McClure presented the testimony of its president, Mr. T. D. McClure, and its on-the-job superintendent, Mr. G. L. Gates. These witnesses testified that during the rental period, McClure experienced numerous "down" days during which it could not proceed with its underground construction work due to the failure of the wellpoint system either to operate or, if operating, to sufficiently drain the construction area. As asserted by McClure, these "down" days were as follows: August 7, 8, 20, 21, 22 and 23; September 5, 8, and 19; October 16 and 22; November 13, 16, 17, 19, 25, 26, 27, 28, 29 and 30; and December 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 17, 18 and 19. After December 19, 1973, McClure ceased using the Moretrench equipment but did not return it to Moretrench until after Moretrench terminated the contract on March 4, 1974.

■ 9. McClure asserts that on each above listed "down" day the wellpoint system failed to function properly due solely to the poor quality of the equipment furnished by Moretrench. However, based upon the evidence as presented at trial, the Court finds that on some of the occasions cited the malfunctioning of the system resulted from either improper maintenance or improper use of the equipment, both matters within the responsibilities of McClure as set out in the contract. In specific,

the Court makes the following findings as to the cause of particular "down" days:

(a) Due to faulty equipment:
Fuel pump—August 7, 8
Vacuum pump—December 3, 4, 5, 6, 7, 10, 11, 12
Power takeoff unit (clutch)—December 13, 14 [2]
Engine—December 18, 19

(b) Due to improper use or maintenance:
Sanding and/or wellpoint placement problems—August 20, 21, 22, 23
September 5, 18
November 19
Poor maintenance (broken floats) November 25, 26, 27

As to the remaining "down" days,[3] the Court finds that insufficient evidence was presented at trial to establish the actual causes. Furthermore, it is noted that Mr. Gates testified that by December 19, 1973, McClure had completed approximately 75% of its underground construction work. Accordingly, the Court finds that only fourteen (14) out of the total of thirty-four (34) "down" days were the result of equipment malfunction and therefore should be compensated for through an offset against the total rental price. As two of these occurred during the first 30 day period and the remaining twelve during the fifth 30 day period, the total offset would be $1,088.54, including tax.[4]

10. In addition to the above mentioned specific "down" days, McClure asserts that it is entitled to an offset for the entire period from December 20, 1973, to March 4, 1974. McClure argues that Moretrench personnel made repeated promises to McClure that Moretrench would take the necessary steps to keep the system functioning and that it was

---

2. It is noted that there was some discrepancy in the evidence as to when the problem occurred with the PTO unit. Some evidence indicated that it occurred on November 16, 17.

3. September 19; October 16, 22; November 13, 16, 17, 28, 29, 30; December 17.

4. $(2/30 \times \$3,967.60) + (12/30 \times \$2,060.24) = \$1,088.54$.

because of such assurances that McClure did not immediately return the wellpoint system to Moretrench. Some evidence was presented at trial, primarily through the testimony of a Ranger employee, Mr. Canter, that for several weeks during this period, Ranger used the Moretrench system. However, the arrangements under which the Ranger use occurred were never developed at trial. As to any assurances made by Moretrench to McClure, the only evidence presented at trial to that effect was the testimony of Mr. McClure that sometime in January 1974, Moretrench promised that it would replace the system. In response, Moretrench presented evidence that Moretrench personnel clearly advised McClure that Moretrench would not make any repairs or replacements until past due rent was paid in full. (Testimony of Mr. Ushery, P. Ex. 12 and D. Ex. 3). Accordingly, the Court finds that a preponderance of the evidence as presented at trial does not substantiate McClure's claim for an offset for the period December 20, 1973, to March 4, 1974. Under the provisions of the contract, McClure could have ended the rental agreement by proper notice to Moretrench and return of the equipment. McClure, however, chose not to do this.

11. McClure also contests three service-repair invoices totaling $184.91 and comprising part of the $16,643.18 sought by Moretrench. The first invoice is in the amount of $57.65 and consists of labor and travel expenses involved in replacing a regulator and rebuilding a generator on September 14, 1973.[5] The second invoice is in the amount of $47.-95 and consists of labor and travel expenses involved in replacing a fuel line on October 5, 1973.[6] The third invoice is in the amount of $79.33 and consists of parts, labor and travel expenses involved in replacing two fuel filters and

an exhaust manifold gasket on October 13, 1973.[7] As set out above in paragraph 4, the rental contract provided that McClure would pay for any repairs and related expenses "unless such repairs are required as the result of defects in the equipment when originally furnished." Based upon the evidence as presented at trial, the Court finds that the charges represented in the three invoices did not result from defects in the equipment when originally furnished. Therefore, in accordance with this contract, McClure is liable to Moretrench for these charges.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter under Title 40, Section 270b(a), U.S.C.A.

2. Although the courts have recognized the existence of an implied warranty of fitness for particular purpose in bailment situations, it has also been expressly held that the specific provisions made a part of the contract presently under consideration constitute a valid, enforceable limitation of the lessor's liability and negate any such implied warranty. *Ivy H. Smith Company v. Moretrench Corporation*, 253 F.2d 688 (5 Cir. 1958). Therefore, when McClure entered into the contract, it waived any defense it might have had based upon the failure of the Moretrench wellpoint system to drain the particular construction site in Pensacola.

3. On the other hand, McClure did have the right to expect a wellpoint system in good working order. The burden of proof with respect to such a defense of failure of consideration, however, rests upon the defendants. The Court is of the opinion that the defendants have met this burden and are therefore entitled to an offset against

---

5. P. Ex. 2, Invoice 9693. Also see, P. Ex. 3 and D. Ex. 3.

6. P. Ex. 2, Invoice 9726. Also see, P. Ex. 3 and D. Ex. 3.

7. P. Ex. 2, Invoice 8285. Also see, P. Ex. 3 and D. Ex. 3.

the rent due only insofar as set out above in its Findings of Fact.

A decree will be entered in accordance herewith awarding the plaintiff a total of $15,554.64.

## JUDGMENT

This cause having come on for final hearing on the pleadings and proof of the respective parties and having been taken under submission and the Court after due deliberation having now entered its Findings of Fact and Conclusions of Law, it is ordered, adjudged and decreed by the Court that a judgment in the amount of fifteen thousand, five hundred fifty-four and 64/100 dollars ($15,554.64) should be and hereby is entered in favor of the plaintiff and against the defendants.

Costs to be taxed against the defendants.